UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DOROTHY HOWARD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:11CV1282 SNLJ |
| ) | (TIA) |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act and Supplemental Security Income under Title XVI of the Act. The case was referred to the undersigned pursuant to 28 U.S.C. § 636(b).

## I. Procedural History

On December 23, 2008, Plaintiff filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), alleging disability beginning December 15, 2008 due to a heart attack. (Tr. 78, 128-34) The applications were denied on April 17, 2009, and Plaintiff requested a hearing by an Administrative Law Judge (ALJ). (Tr. 76-82, 85-86) On April 7, 2010, Plaintiff testified at a hearing before an ALJ. (Tr. 21-75) In a decision dated June 11, 2010, the ALJ determined that Plaintiff was not under a disability from December 15, 2008 through the date of decision. (Tr. 12-19) On May 27, 2011, the Appeals Council denied Plaintiff's request for review. (Tr. 1-3) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the hearing before the ALJ, Plaintiff was represented by counsel. The ALJ first questioned

Plaintiff, who testified that she had never married but had four children and three grandchildren. Plaintiff was 55 at the time of the hearing. Plaintiff lived alone in a single-story ranch home with a partially finished basement. The washer and dryer were in the basement, as well as a sitting area with a TV. Plaintiff testified that she weighed 201 pounds and measured 5 feet, 5 inches. She was able to read, write, and perform simple math. She had no income but received food stamps. Plaintiff did not participate in the Medicaid program. (Tr. 26-30)

Plaintiff last worked for Jackson Hewitt, a tax company, for approximately two weeks. Upon questioning by her attorney, Plaintiff stated that she attended paid training sessions at Jackson Hewitt and knew she did not work an entire month there. Plaintiff testified that her job entailed greeting people at the door and inputting their personal information on the computer. She quit the job because she was unable to perform the duties. Plaintiff specified that her left arm hurt and felt like it weighed a ton. She also reported chest pains and bad problems with her knees and hip. Prior to that position, Plaintiff worked as a cashier for the Salvation Army for a couple of years. In addition, she had worked as a sorter at a recycling place. Plaintiff left that job because she could not pick up the clothes, which were too heavy. Plaintiff also worked as a cashier and sorter for Missouri Goodwill Industries. She left because her supervisor said she was unable to handle the job. In addition, Plaintiff had been a receptionist for H&R Block and a part-time seasonal employee for the postal service as a mail sorter. Plaintiff also previously worked for Northgate Park Nursing Center serving food to patients and setting up tables; at a small neighborhood store as a cashier; at Grace Hill Neighborhood Health counseling teenage girls; for Morgan Building Services cleaning offices; at Target and Toys R Us as a cashier; for School Services and Leasing as a school bus monitor; and for the St. Louis Board of Education helping school nurses. (Tr. 30-40)

Plaintiff further testified regarding her medical conditions that impacted her ability to work. She stated that she could not work due to heart problems, arthritis, and vertigo. Plaintiff testified that she suffered a heart attack on December 15, 2008. She also had a stent in place, but her arteries were too small for additional stents. Doctors were treating Plaintiff with medication instead. Plaintiff stated that she a had recent follow-up examination and was planning to return for more blood work. (Tr. 40-42)

With regard to daily activities, Plaintiff testified, as reported in her functional report, that when she woke up, she made coffee and waited for her daughter to bring breakfast. Plaintiff did not cook her own breakfast but could make cereal sometimes. Plaintiff then took a bath, watched TV, and waited for her daughter to bring lunch. Plaintiff no longer grocery shopped because the last time she went to the store, her legs gave out. On a normal day, Plaintiff watched TV, talked on the phone, and put her feet up. She was able to bathe herself and put on clothes, but she needed help getting out of the tub. (Tr. 42-44)

Plaintiff took various medications for high cholesterol, heart, hypertension, pain, and dizziness. The pain medication caused drowsiness. Plaintiff also testified that she stopped smoking about 8 weeks before the hearing. Plaintiff did not drink alcohol or use illegal drugs. Plaintiff had a driver's license but stopped driving in November 2009. She cooked eggs, washed her coffee cup, and did laundry by throwing the clothes down the stairs and sliding down. She did not vacuum. Plaintiff stated that she grocery shopped with her daughter or son. She rode a cart or leaned on a cart to shop. Plaintiff testified that she could walk a half block before needing to sit down. The walk would take about 5 minutes. She could stand for 15 minutes at a time and sit for 30 minutes before experiencing burning and pain. According to Plaintiff, her doctor told her not to lift more than 5

3

pounds, but that was not in any report. (Tr. 44-49)

Plaintiff's attorney also questioned Plaintiff about her alleged inability to work. With regard to using the computer, she stated that she had trouble with her left arm, which lost feeling. She experienced the pain every day and was unable to hold a cup or wring a towel with her left hand. She needed help getting out of the tub and fastening her bra. Plaintiff also experienced chest pains and shortness of breath while working at Jackson Hewitt. In addition, Plaintiff testified that she had problems remembering things. When sitting for 30 minutes, Plaintiff would feel a burning sensation on her left side, which her doctor said was arthritis. She needed to stand up for a few minutes, but had to hold on something to stand or she would fall down due to pain in her knees. Plaintiff stated that she experienced pain and swelling in her knees and feet, so she had to keep her feet elevated. Her pain medication caused her to sleep at least half the day. (Tr. 49-53)

Plaintiff further testified that, while she could do light laundry, she had to slide down the stairs and crawl back up due to pain in her knees. In addition, Plaintiff experienced dizziness two or three times a week. She felt dizzy when turning corners as a vehicle passenger and at home. The dizziness lasted about an hour, and although the medication helped, she would still get motion sickness in the car. Plaintiff also continued to have chest pain, which lasted a couple of days. When walking a half block, she needed to sit down because she felt as though she was having a heart attack. The chest pain did not occur as frequently with her medication. The chest pain affected her daily activities because Plaintiff was afraid to move. (Tr. 53-57)

Upon further questioning by the ALJ, Plaintiff testified that she did not recall seeing Dr. Park in April 2009. However, the ALJ noted that Plaintiff refused to allow the doctor to conduct range of motion testing. Plaintiff disagreed that Dr. Park did anything other than ask her to bend down and

4

that the exam lasted a mere 5 minutes instead of the 35 minutes reported by the doctor. Although the ALJ noted that the report showed no problems in grip strength and indicated continued resistance by Plaintiff, the Plaintiff continued to insist that Dr. Park never touched her. (Tr. 57-59)

Plaintiff's daughter-in-law, Pauletta Smith, also testified at the hearing. She stated that she picked up Plaintiff from work at Jackson Hewitt three times due to numbness in her left arm and feeling light-headed. Ms. Smith observed that Plaintiff looked "lacksidaisy" and not like herself. Ms. Smith also testified that Plaintiff had problems remembering things, and she was always tired. Her head constantly hurt, and she lost feeling in her arm. Plaintiff no longer cooked or went to the store. Ms. Smith took Plaintiff to a doctor's appointment in April 2009 but sat outside the exam room. She recalled that the appointment took longer than 15 minutes. According to Ms. Smith, Plaintiff told her that during the exam, she had to touch her toes and run on a treadmill. She did not recall whether the doctor performed a range of motion test, but Plaintiff was out of wind upon completion of the exam. In addition, Ms. Smith testified that she either cooked or brought Sonic to Plaintiff. The only thing Plaintiff made was coffee. (Tr. 61-68)

Delores Alviera Gonzales, a vocational expert ("VE") also testified regarding Plaintiff's vocational history. Plaintiff's past jobs in the light or below category included mail sorter, school bus monitor, cashier, data entry clerk, community worker, support staff worker, sorter, and receptionist. Her clerical and customer service skills could be utilized in other jobs. (Tr. 69-70)

The ALJ then posed hypothetical questions to the VE. The ALJ asked the VE to assume an individual with Plaintiff's education, training, and work experience who was able to perform light work with limitations including climbing stairs and ramps occasionally; never climbing ropes, ladders, or scaffolds; stooping, kneeling, and crouching occasionally; never crawling; and reaching in all

5

directions but with the left arm only frequently. The VE answered that such individual could work as a mail sorter position, school bus monitor, cashier, data entry clerk, community worker, and receptionist. (Tr. 70)

In hypothetical two, the VE assumed the same exertional limitations with a sit/stand option and the ability to change positions frequently. The VE answered that the community worker and support staff worker could change positions at will, and the cashier position allowed a sit/stand option. However, the other positions would require a sedentary or standing position without the sit/stand option. For the cashier position, which was light, semi-skilled work, 3,479,390 jobs existed nationally; 81, 800 existed in Missouri; and 34,850 existed in the St. Louis metropolitan area. Approximately 20% of the jobs allowed a sit/stand option. Any of the community worker positions allowed the workers to sit or stand. (Tr. 70-71)

For the third hypothetical, the ALJ asked the VE to assume sedentary level work without the sit/stand option. The VE testified that the only jobs meeting that criteria were data entry clerk and receptionist. If the ALJ added limitations of walking only 5 minutes at a time, standing only 15 minutes at a time, sitting only 30 minutes at a time, and lifting no more than 5 pounds, no jobs would be available. (Tr. 72)

Last, Plaintiff's attorney questioned the VE regarding the data entry and receptionist jobs. If the individual could only occasionally reach, handle, and finger, she would be unable to work either job, as they required frequent reaching, handling, and fingering. In addition, if the individual needed to take one or two unscheduled breaks, the person would not be able to work competitively. (Tr. 72-73)

In a Function Report – Adult dated January 3, 2009, Plaintiff reported that from the time she

6

woke up until she went to bed, she started the coffee maker; prayed; waited for her daughter to bring breakfast; washed up; took a bath; watched TV or listened to radio; waited for her daughter to bring lunch; took a nap; visited with her daughter; ate dinner; and stayed up until 4 or 5 o'clock in the morning. Plaintiff stated that she could no longer wrestle or play tag with her grandchildren. She was afraid to go to sleep. Plaintiff was able to care for her personal needs, although she sometimes forgot to comb her hair or take a bath. Her children called to remind her to take medication. Plaintiff further reported that she did not cook meals because the medication made her tired. Friends and family members did the laundry and helped with housework. Plaintiff went outside 2 to 3 times a week. She was able to drive but did not own a car. Plaintiff was able to shop for food and household items, and she went shopping once a month for about an hour. Plaintiff enjoyed reading, bowling, and watching TV. She no longer bowled because she was afraid she would get hurt. In addition, Plaintiff stated that she needed reminders to go places, and she needed someone to accompany her. She had problems getting along with others because people said she was moody and scared to do things. Her condition affected her ability to lift, walk, climb stairs, complete tasks, and get along with others. Plaintiff opined that she could walk 2 blocks before needing to rest for 10 minutes. She was unable to pay attention for very long, and she did not follow written instructions very well. Further, Plaintiff reported an inability to handle stress. (Tr. 182-89)

Paulette Smith completed a Function Report – Adult – Third Party on behalf of Plaintiff. She stated that Plaintiff previously was able to go to the park and climb steps. However, she was now unable to breathe and had trouble sleeping. Plaintiff needed reminders to care for her personal needs and take medication, so Ms. Smith had to call her daily. Ms. Smith further reported that Plaintiff was able to prepare her own meals once a day but that they were not "normal" meals and were sometimes

not completed due to fatigue. Ms. Smith often purchased a meal for Plaintiff. According to Ms. Smith, Plaintiff never made her bed, and clothes were strewn everywhere. Plaintiff needed help washing dishes, cleaning the bathroom, sweeping, and washing herself. Ms. Smith opined that Plaintiff did not do house or yard work because she was not mentally motivated. Plaintiff was able to go out alone, drive a car, shop for food, pay bills, and count change. In addition, she enjoyed spending time with her grandchildren, nieces, and nephews, which prevented her from becoming depressed. She also spent a lot of time with family. Ms. Smith stated that Plaintiff's condition affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, and use her hands. She could not walk very far and needed to sit for a while to rest before resuming walking. Plaintiff was able to understand simple spoken instructions, but she did not handle stress or changes to routine well. (Tr. 207-14)

### III.  Medical Evidence

On December 15, 2008, Plaintiff was admitted to the hospital for chest pain. She was found to have acute coronary syndrome and an ST elevation a myocardial infarction. Cardiac catheterization on December 16, 2008 revealed normal central aortic pressure with elevated left ventricular and diastolic pressure, reflective of left ventricular diastolic dysfunction; significant three-vessel atherosclerotic coronary artery disease; preserved left ventricular systolic function with normal regional wall motion and no mitral regurgitation; successful stenting of the upper distal anterior descending coronary artery; successful plain balloon angioplasty of the first diagonal coronary artery; and successful stenting of the posterior descending coronary artery. Plaintiff was discharged on December 18, 2008 with the following diagnoses: acute coronary syndrome; non-ST segment elevation myocardial infarction; multi-vessel obstructive coronary disease; hypertension; dyslipidemia;

8

gastroesophageal reflux disease syndrome; a urinary tract infection; and obesity. (Tr. 232-47)

On January 22, 2009, Plaintiff saw Dr. Michael Wood for a follow-up visit. She complained of chest discomfort, which Dr. Wood believed sounded more like GERD. Plaintiff was noncompliant with her medications. Dr. Wood encouraged Plaintiff to take her medicine, and he provided some medication samples. (Tr. 294)

Dr. Inna Park performed a consultative examination on April 14, 2009. Dr. Park noted that Plaintiff smoked half a pack of cigarettes per day for 12 years but quit in December 2008. Dr. Park further noted that Plaintiff was physically resistant during portions of the range of motion exam, particularly in the left shoulder and lower extremities. The physical examination was otherwise normal. Dr. Park assessed coronary artery disease status post myocardial infarction, New York Heart Association Classification I. (Tr. 316-22)

On April 17, 2009, April Riley, a state agency single decision maker, completed a Physical Residual Functional Capacity Assessment. Ms. Riley opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; stand about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull in an unlimited manner. Further, Plaintiff could frequently climb ramps/stairs; balance; stoop; kneel; crouch; and crawl. She could occasionally climb ladders/ropes/scaffolds. Plaintiff had no manipulative, visual, or communicative limitations. Environmental limitations included avoiding concentrated exposure to hazards. (Tr. 323-29)

On August 7, 2009, Plaintiff established care at People's Health Center for status-post myocardial infarction (MI), hypertension, coronary atherosclerosis, hyperlipidemia, and medication management. (Tr. 353-6)

On November 24, 2009, Plaintiff followed up at the People's Health Center, requesting a

medication refill and complaining of pain in her knees and left arm. Plaintiff's reported symptoms included crepitus, decreased mobility, limping, night pain, and spasms. The physical exam was normal. Mollie Hossfeld, M.D., assessed benign hypertension, hyperlipidemia, and pain in limb. (Tr. 351-2)

On January 26, 2010, Plaintiff presented for a follow-up visit with Dr. Hossfeld. She complained of bilateral knee and left arm/shoulder pain. The examination was negative for chest pain, claudication, and irregular heartbeat/palpitations. Dr. Hossfeld assessed benign essential hypertension; hyperlipidemia; myalgia and myositis NOS; and adhesive capsulitis of shoulder. Dr. Hossfeld discussed the need for an x-ray and the importance of range of motion exercises. (Tr. 348-50)

On January 28, 2010, Walter A. Dimmitt, M.D., a cardiologist, examined Plaintiff for complaints of discomfort suggestive of angina. On February 16, 2010, Dr. Dimmitt noted that Plaintiff had symptoms suggestive of atypical chest pain. Dr. Dimmitt also noted that the stenotic vessels were too small for PCI/stent. (Tr. 331-3)

Plaintiff was hospitalized from February 16 to 17, 2010 by Dr. Penilla's office due to progressive, recurrent angina pectoris. Plaintiff underwent cardiac catheterization on February 16, 2010. The procedure revealed left ventriculogram showing left ventricular hypertrophy with normal contractility; coronary artery disease with continued patency of drug eluting Sirolimus stent to the mid left anterior descending and proximal posterior descending branch deployed in December 2008; severe and diffuse disease of the first marginal branch of a small caliber; and severe and diffuse disease of the lower mid and distal left anterior descending. Dr. Antonio R. Penilla recommended continuation of medical therapy with maximization of beta blockers, ACE inhibitors, use of nitrates,

and risk factor modification including control of hypertension, dyslipidemia, weight, diet, and exercise. Discharge diagnoses included recurrent angina pectoris; coronary artery disease, severe diffuse involving the marginal branch of the circumflex and the diagonal branch; continued patency stent to the LAD and the posterior descending branch; left ventricular hypertrophy with normal left ventricular contractility; dyslipidemia; hypertension; and obesity. Dr. Penilla advised Plaintiff to refrain from extraneous heavy physical effort but recommended that Plaintiff exercise. (Tr. 335-43)

On March 1, 2010, Plaintiff followed up with Dr. Hossfeld for hypertension, coronary artery disease, and medication refills. Dr. Hossfeld confirmed cardiology was unable to stent lesion during Plaintiff's hospitalization in February 2010. However, Plaintiff had an appointment with Dr. Dimmitt the following week. The physical exam was normal. Dr. Hossfeld noted that Plaintiff was counseled on health maintenance, including smoking cessation and following an exercise program. (Tr. 345-7)

## IV. The ALJ's Determination

In a decision dated June 11, 2010, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2011. She had not engaged in substantial gainful activity since December 15, 2008, the alleged disability onset date. Further, the ALJ determined that Plaintiff had severe impairments, including coronary artery disease, status post myocardial infarction; hypertension; dyslipidemia; and obesity. However, Plaintiff did not have an impairment or combination of impairments that met or medically equaled on of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15)

The ALJ carefully considered the record and determined that Plaintiff had the residual functional capacity ("RFC") to perform light work. She was able to occasionally climb stairs and ramps, stoop, kneel, or crouch. However, she should never crawl or climb ropes, ladders, or

11

scaffolds. Further, Plaintiff could frequently reach in all directions with her left arm. She needed to avoid concentrated exposure to hazards of heights. In determining Plaintiff's RFC, the ALJ noted Plantiff's testimony, as well as the testimony from her daughter-in-law, Paulette Smith, that Plaintiff was unable to engage in most activities. In addition, the ALJ assessed the objective medical evidence in the record, noting that no doctors restricted Plaintiff's physical activity, other than instructions to avoid heavy physical effort. The ALJ found that Plaintiff's statements concerning the limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC finding. In addition, the ALJ noted Plaintiff's poor work history. Further, Plaintiff's daughter-in-law testified that Plaintiff had a greater ability to perform activities than Plaintiff reported. The assessment by the State Agency was also generally consistent with the RFC finding, except for the findings of less limited postural restrictions. (Tr. 15-18)

The ALJ then relied on the VE's testimony and found that Plaintiff was capable of performing her past relevant work as a mail sorter, cashier, data entry clerk, community worker and support staff, sorter, and receptionist. Thus, the ALJ concluded that Plaintiff had not been under a disability from December 15, 2008 through the date of the decision. (Tr. 18-19)

## V.  Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step

evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523,

13

527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[1] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

## VI. Discussion

Plaintiff argues that substantial evidence does not support the ALJ's decision because the ALJ inadvertently weighed the opinion of a state agency lay person under the rules appropriate for weighing the opinion of a medical consultant and because the ALJ failed to fully and fairly develop the record. Defendant, on the other hand, contends that the ALJ properly determined that Plaintiff's

---

[1] The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

14

allegations were inconsistent with medical treatment notes and medical noncompliance and that the ALJ properly formulated Plaintiff's RFC. With regard to Plaintiff's specific claims of error, the Defendant argues that the ALJ did not rely on the state agency lay person's opinion in formulating Plaintiff's RFC and instead independently evaluated the evidence in the record. In addition, Defendant maintains that the ALJ did not have a duty to further develop the record, as Plaintiff's alleged musculoskeletal impairments were fully developed in the record.

The undersigned finds that substantial evidence supports the ALJ's decision such that the final decision of the Commissioner should be affirmed. Plaintiff first asserts that the ALJ inadvertently weighed the opinion of a state agency lay person under the rules appropriate for weighing the opinion of a medical consultant. Plaintiff does not argue that the RFC finding would have been different had the ALJ known that a lay person, not a physician, completed the RFC assessment. Defendant correctly notes that the ALJ did not rely on the state agency opinion in determining Plaintiff's RFC. Instead, the ALJ relied on the medical records of treating doctors, which showed postural limitations more restrictive than found by the state agency. Only after the ALJ reviewed this evidence did he note that the RFC assessment was generally consistent with the ALJ's findings, with less restrictive postural limitations. (Tr. 18)

Plaintiff relies on Dewey v. Astrue, 509 F.3d 447, 449 (8th Cir. 2007), for the proposition that a court must remand a case where the ALJ "inadvertently weigh[s] the opinion of a lay person under the rules appropriate for weighing the opinion of a medical consultant, which would be a legal error in applying the ruling." In Dewey, however, the ALJ placed more weight on the assessment performed by a lay person over the more restrictive opinion of the plaintiff's treating physician. Id. Therefore, the court remanded for rehearing because it could not "say that the ALJ would inevitably

have reached the same result if he had understood that the Residual Functional Capacity Assessment had not been completed by a physician or other qualified medical consultant." Id. at 449-50.

In the present case, however, the ALJ assessed the Plaintiff's credibility and the medical evidence from Plaintiff's physicians before considering the opinion of the state agency lay person. The ALJ noted that Plaintiff's range of motion tests were either normal, or she was deliberately resistant to such testing. (Tr. 16) In fact, her doctors consistently encouraged Plaintiff to exercise. (Tr. 17) Nothing in the medical records contradicts the ALJ's RFC finding that Plaintiff could perform light work with certain limitations, which were more restrictive than the state agency's opinion. "Consequently, the ALJ supported his opinion with sufficient medical evidence and medical opinions for [the Court] to conclude that, even if the ALJ understood that the RFC assessment[ ] was completed by a non-physician, he would have reached the same result, and any error in attributing the assessment to that of a physician does not warrant remand." Ott v. Astrue, No. 4:10CV2036 CDP, 2012 WL 1185026, at *15 (E.D. Mo. April 9, 2012).

Plaintiff also argues that the ALJ failed to fully and fairly develop the record with regard to Plaintiff's diagnosis of crepitus. In response, Defendant notes that the duty to develop the record arises only where a critical issue has not been developed. See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (finding that a duty to re-contact a treating physician for clarification "arises only if a crucial issue is undeveloped"). In this case, however, during the November 24, 2009 examination by Dr. Hossfeld, upon which the Plaintiff relies, Plaintiff merely listed crepitus as one of her symptoms. (Tr. 351) The musculoskeltal examination and the examination of extremities showed normal musculature; no joint deformity or abnormalities; normal range of motion for age; and no edema, cyanosis, or clubbing. Dr. Hossfeld assessed pain in limb but did not diagnose crepitus of the

16

knees as Plaintiff suggests. Because none of Plaintiff's doctors diagnosed crepitus, Plaintiff's allegation of such medically determined impairment was not an undeveloped crucial issue requiring further development. Indeed, Plaintiff's own statements are the only evidence supporting her assertion that she suffers from crepitus and "are insufficient to establish the existence of a physical impairment." Smith v. Astrue, No. 4:10CV1319 DDN, 2011 WL 4445834, at *7 (E.D. Mo. Sept. 26, 2011) (citing 20 C.F.R. § 416.928(a)). Thus, the ALJ was not required to further develop the record, and the Commissioner's decision finding the Plaintiff not disabled should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the final decision of the Commissioner denying social security benefits be **AFFIRMED**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

        /s/ Terry I. Adelman  
UNITED STATES MAGISTRATE JUDGE

Dated this  8th  day of August, 2012.